Date signed April 03, 2012



PAUL MANNES
U. S. BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at Greenbelt

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| CONGRESSIONAL HOTEL CORP. | : | Case No. 11-26732-PM |
| | : | |
| Debtor | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | : | |
| CASCO HOTEL GROUP, LLC | : | Chapter 11 |
| | : | Case No. 11-26880-PM |
| Debtor | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | | Jointly Administered Under Case No. 11-26732-PM |

**MEMORANDUM OF DECISION**

  Before the court is Debtors' Application filed November 4, 2011, For Approval of Employment of Molinaro Koger As Exclusive Real Estate Broker *Nunc Pro Tunc* (the "Employment Application"). The Employment Application seeks approval of Debtors' employment of Molinaro Koger, a real estate brokerage firm ("Koger"), under an exclusive brokerage agreement dated January 13, 2011, as extended.  The major unsecured creditor in this case, Mervis Diamond Corporation ("Mervis"), filed an Objection to the Employment Application; Koger filed a Response to Mervis' Objection; and the court received exhibits and heard testimony and arguments of the parties at an evidentiary hearing held on March 7, 2012.

**BACKGROUND**

  These cases were commenced by the filing of voluntary Chapter 11 petitions by Congressional Hotel Corp. ("CHC") on August 15, 2011, and CASCO Hotel Group, LLC ("CASCO") on August 17, 2011, (collectively, the "Petition Dates").  This case involves the Legacy Hotel and Meeting Centre at 1775 Rockville Pike, Rockville MD (the "Hotel").  The

instant Chapter 11 filings closely followed the dismissal on May 18, 2011, of CHC's Chapter 11 Case No. 09-17901 (the "2009 Case").

In the 2009 Case, CHC had filed several 'bootstrap' plans of reorganization but ultimately concluded that sale of the Hotel was the more logical course to pursue. Accordingly, on January 18, 2011, CHC executed an Exclusive Brokerage Agreement with Koger (the "Brokerage Agreement"), and on January 31, 2011, CHC filed an application pursuant to 11 U.S.C. §327 for authority to employ Koger under the Brokerage Agreement *nunc pro tunc* to January 18, 2011. The court notices CHC's representation in the 2009 Case that Koger began its marketing efforts on behalf of CHC on January 24, 2011. *See* CHC's Opposition To Motion To Dismiss, Chapter 11 Case No. 09-17901, D.E. 254, Par. 15. As such, in the 2009 Case, CHC filed its application for authority to employ Koger one week after Koger's commencement of services and two weeks after executing the Brokerage Agreement. On March 3, 2011, in the absence of objection, the court approved this application in the 2009 Case.

The instant cases were commenced with an eye toward liquidation from the outset: they were filed specifically for the purpose of consummating an Agreement of Sale Debtors had reached with an entity known as 1776 Rockville Pike, LLC ("Buyer No. 1"), at the latter's instance. *See* Debtors' Motion For Order (A) Authorizing Sale of Substantially All of Debtor's Assets . . . (the "Sale Motion"), D.E. 17, Par. 18 ("To preserve the Agreement of Sale, and upon request of the Purchaser, the Debtors commenced this case. The Agreement of sale is currently pending.") Debtors filed the Sale Motion on August 24, 2011, just nine days after commencing these cases. The Sale Motion, Par. 20, discusses the benefit of the sale to the estate "after closing costs and commissions," and Section 14 of the Agreement of Sale, attached as Exhibit 4 to the Sale Motion, discloses Koger's involvement as a broker in the proposed sale and Debtors' obligation to pay its commission, albeit without stating any amount or terms. No one disputes that Koger was responsible for procuring the offer from Buyer No. 1.[1]

On October 6, 2011, Mervis filed a notice stating that it had obtained a higher offer for the Hotel from Baywood Hotels, Inc. ("Buyer No. 2"). *See* Notice By Mervis Diamond Corporation Of Obtaining Higher And Better Offer . . . , D.E. 65. Mervis' Notice prompted

---

[1] *See* Employment Application, Par. 7 ("Molinaro Koger's efforts resulted in the Debtors obtaining an offer from 1775 Rockville Pike, LLC ('1775 Rockville Pike'), a Delaware Limited Liability Company to purchase the property for $18,000,000.00.")

Debtors' filing of a motion to approve auction procedures on October 15, 2011. D.E. 68. Debtors still had not filed an application requesting authority to employ Koger. Mervis objected to Debtors' proposed procedures on various grounds, pointing out that, "The Debtors are very coy about the obligation to pay a brokerage commission in connection with [Buyer No.1's] contract. To the extent they intend to pay a brokerage commission, it should be revealed to the Court and the creditors as part of the approval process." D.E. 74, October 24, 2011, fn. 2.

Debtors filed the Employment Application on November 4, 2011, more than eleven weeks after the Petition Dates, requesting approval of Koger's employment under the terms of the Brokerage Agreement retroactive to the Petition Dates. The court issued the following instruction on November 30, 2011, "Please explain why this order should be entered nunc pro tunc." D.E. 99.

Also on November 30, 2011, the court approved a consent order between Debtors, Mervis, Buyer No. 1, and the major secured creditor in the case, Citizens Bank of Pennsylvania, establishing procedures for a court-supervised auction of the Hotel and related assets (the "Bidding Procedures Consent Order"). D.E. 98. The Bidding Procedures Consent Order included a document entitled "Bid Procedures For Auction Sale of Debtors' Assets" and was served on all creditors and parties in interest, including Koger. Conspicuous by its absence in the Bidding Procedures Consent Order and the Bid Procedures themselves is any reference to a commission to be paid to Koger or the conditions thereof or whether any bid would be subject to payment of a commission. There is considerable reference in the Order and Bid Procedures to the break-up fee of $350,000 to be paid to Buyer No. 1 in the event that another bidder would prevail at the auction, but no reference whatsoever to a $300,000 commission payable to Koger.

After the auction conducted by the court on December 8, 2011, Buyer No. 2 was declared the prevailing bidder. The sale to Buyer No. 2 and the terms of the Agreement of Sale were approved by order entered January 23, 2012 (the "Sale Order"). The Sale Order provides, *inter alia*, that, "Except for the fees and expenses of brokers, finders, or financial advisors (for which the Debtors are solely responsible) *as are or may be approved by the Court*, neither the Debtors, the Purchaser nor any other entity have any obligations to pay any fees, commissions or other similar compensation to any broker, finder, or financial advisor in connection with the transactions authorized herein." *See* Sale Order, Par. 26 (emphasis added).

Debtors never filed a response to the court's instruction for an explanation of the basis for *nunc pro tunc* relief on the Employment Application. Mervis filed an objection to the

Application, asserting that the Application should be denied as Koger was not disinterested and *nunc pro tunc*.employment was not justified. D.E. 100. Neither the United States Trustee nor any creditor other than Mervis filed any response to the Employment Application.[2]

On March 6, 2012, the day before the evidentiary hearing on the Application, Koger filed a response to Mervis' objection. D.E. 144. On the issue of disinterestedness, Koger asserts essentially that its claims under the Brokerage Agreement as of the commencement of these cases were too contingent to render Koger a creditor, that Koger is just as disinterested in these cases as it was upon approval of its employment in the 2009 Case, and that in any event, "this Court should exercise its equity power to acknowledge Koger's status as a 'disinterested' party under 11 U.S.C. §327(a) and to preserve Koger's right to a commission as an administrative expense for the benefit of the estate." On the issue of *nunc pro tunc* relief, Koger argues that,

> Under any test, Koger's employment should be approved *nunc pro* tunc. Koger was employed in CHC's first bankruptcy proceeding and it continued to market the Property even after the first bankruptcy case was dismissed. Even after the second bankruptcy case was filed, <u>Koger was assured that it need not do anything else (in connection with the bankruptcy cases) in order for it to get paid its commission</u> other than continue to act as a broker. Although Koger is a sophisticated real estate broker, it is not sophisticated in bankruptcy matters. Neither David Altobello nor Robert Koger had any experience with professional retention matters in bankruptcy cases, <u>other than in CHC's first bankruptcy case</u>. Indeed, Koger was an innocent third party who believed, (rightfully so) that it would be paid a commission only upon a closing of the Property. Although in hindsight, the Debtors should have filed the Application to Employ earlier, this was not something Koger knew, and upon information and belief, the Application to Employ was not filed earlier simply because Debtors' counsel was diligently working to approve the sale of the Property and to address the many other important beginning-of-case issues, and inadvertently did not file the Application to Employ earlier.
>
> Additionally, for reasons explained above, although Koger was approved by this Court in CHC's first bankruptcy petition, for reasons beyond Koger's control, CHC had to a file a second bankruptcy petition after Koger had already introduced Baywood to the Property. Koger's services in connection with the Agreement provided a substantial benefit to the Debtors' asset because Baywood, the ultimate contract purchaser of the Property, was directly procured by Koger's marketing efforts. Moreover, the sale of the

---

[2]The gross sale proceeds of $19.5 million appear sufficient to pay Citizens' secured claim filed in the amount of $14,597,998.88 in full, therefore, the administrative priority that would be accorded Koger's commission claim pursuant to the Employment Application would appear to directly impact the net sale proceeds available for distribution to the unsecured creditors.

Property was a vital component of the reorganization plan that would ultimately benefit all creditors.

(Emphases added.)

At the evidentiary hearing on the Employment Application, Koger, through its principal David Altobello, testified that Koger relied entirely upon Debtors' counsel for requesting court approval of Koger's employment.[3] Debtors' explanation for the lateness of the Employment Application was a simple acknowledgment by Debtors' counsel, as a preliminary statement in open court at the hearing on the Application, that it was entirely his fault.

**DISCUSSION**

Section 503(b)(2) of the Bankruptcy Code, Title 11 U.S.C., permits allowance of administrative expense claims for compensation awarded to a professional pursuant to 11 U.S.C. §330(a), which in turn requires employment of the professional pursuant to 11 U.S.C. §327. Section 327(a) permits the trustee's employment of professionals "to represent or assist the trustee in carrying out the trustee's duties under this title."[4] Worded as such, and close scrutiny of the ongoing administration of bankruptcy estates being a priority, §327(a) is generally construed to require that employment be approved prior to or upon the professional's commencement of services.

Unlike the 2009 Case, the instant Employment Application was filed over eleven weeks after the predicate for court approval arose, the commencement of the cases.[5] By the time the Application was filed, the Brokerage Agreement had expired by its own terms[6].

---

[3]Debtors' counsel in the instant cases is the same firm as represented CHC in the 2009 Case.

[4]Pursuant to 11 U.S.C. §1107(a), chapter 11 debtors in possession, such as Debtors herein, have the rights and powers of a trustee.

[5]In the Employment Application, Par. 7, Debtors emphasize that Koger had never ceased rendering the services for which it was engaged during the 2009 Case, and the Employment Application requests authority to employ Koger under the same Brokerage Agreement that had been approved in the 2009 Case. Accordingly, Koger was actively representing Debtors upon commencement of the instant cases.

[6] In Par. 13 of the Employment Application, Debtors represent that the Brokerage Agreement "was modified from time to time, to include CASCO as a party and to extend the Expiration Date of the Agreement first through July 15, 2011 and by second, through and including September 28, 2011."

The Fourth Circuit has not weighed in on a bankruptcy court's authority to approve a professional's employment retroactively, but several circuits have, and articulate various standards for doing so. *In re Jarvis*, 53 F.3d 416 (1st Cir. 1995) ("extraordinary circumstances"); *In re Keren Limited Partnership*, 189 F.3d 86 (2d Cir. 1999) ("extraordinary circumstances"); *In re Arkansas*, 798 F.2d 645 (3d Cir. 1986) and *F/S Airlease II, Inc.*, 844 F.2d 99 (3d Cir. 1988), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137 (1988) ("extraordinary circumstances"); *In re Singson*, 41 F.3d 316 (7th Cir. 1994) ("excusable neglect"); *In re Atkins*, 69 F.3d 970 (9th Cir. 1995) ("exceptional circumstances"); *In re Albrecht*, 233 F.3d 1258 (10th Cir. 2000) ("extraordinary circumstances"). These courts set out various factors for considering whether the standard for retroactive approval has been met. All courts include the professional's qualification for employment under 11 U.S.C. §327 as an essential factor.[7]

Within the Fourth Circuit, the United States District Court for the District of Maryland, Motz, J., considered the issue in *The Binswanger Companies v. Merry-Go-Round Enterprises*, 258 B.R. 608 (D. Md. 2001) ("*MGRE*") and discussed the standards for retroactive employment set out in the *Jarvis*, *Atkins* and *Singson* decisions:

> Several circuit courts are cautious in permitting retroactive appointment, requiring some sort of extraordinary circumstances. The Ninth Circuit requires 'professionals seeking retroactive approval [to] satisfy two requirements: they must (1) satisfactorily explain their failure to receive prior judicial approval; and (2) demonstrate that their services benefitted the bankrupt estate in a significant manner.' *Atkins*, 69 F.3d at 974. The First Circuit requires, beyond the statutory requirements for any appointment, 'that the delay in seeking court approval resulted from extraordinary circumstances,' which do not include, for example, 'tardiness occasioned merely by oversight.' *Jarvis*, 53 F.3d at 418. . . . The Seventh Circuit has adopted a more lenient test of 'excusable neglect.' *In re Singson*, 41 F.3d 316 (7th Cir. 1994).

*Id.* at 612-613.

---

[7] The pertinent provision is that the trustee may employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. §327(a). "Disinterested person" is defined as, *inter alia*, a person that "(A) is not a creditor . . .; and (C) does not have an interest materially adverse to the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. §101(14)(A). "Creditor" is defined as, *inter alia*, an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor . . . ." 11 U.S.C. §101(10)(A). "Claim" is defined as, *inter alia*, a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §101(5)(A).

As in *MGRE*, this court cannot find justification for approving Koger's employment retroactive to the Petition Dates. Even the more lenient standard argued by Koger, what it terms the "Satisfactory Explanation/Substantial Benefit" test, would not be met here. The court emphasizes that before it is not Koger's application but Debtors' Application: Debtors alone had standing to file the Application. Debtors have not articulated any extraordinary circumstances or any reason whatsoever justifying retroactive approval. The court notes that Debtors' counsel did not overlook the filing of its own employment application two weeks into the cases. Koger passionately argues its innocence and naïveté in the late filing of the Application, but again, the Application was not Koger's to file, it was Debtors', and Debtors certainly were aware of the requirement of timely application as evidenced in the 2009 Case as well as the instant cases. If Koger's explanation of innocent ignorance is considered, the court finds it unpersuasive where Koger gained recent, first-hand experience with the process in the 2009 Case.

Compounding the problem with the timing of the Employment Application is the issue of Koger's qualification for employment. The facts are undisputed that Koger was in a prepetition relationship with CHC by virtue of the Brokerage Agreement executed by CHC on January 18, 2011; that the Brokerage Agreement was in effect upon the Petition Dates; and that prepetition, Koger had introduced to Debtors both Buyer No. 1 and Buyer No. 2. The Brokerage Agreement, Par. 4, provides for Koger's entitlement to a commission of $300,000 "whether or not Broker was a procuring cause of any conveyance . . .", giving rise at least to a contingent claim when Koger introduced Buyer No. 1 and Buyer No. 2 prepetition, and rendering Koger a creditor under the Bankruptcy Code. *See* fn. 7, *infra*. Nevertheless, in their Employment Application, Par. 17, Debtors assert that Koger is a disinterested person as defined in 11 U.S.C. §101(14) and has no relationship to Debtors. Koger's prepetition relationship to Debtors and prepetition claims pursuant to the Brokerage Agreement were matters to be disclosed in the Application, and Koger's lack of disinterestedness by definition renders Koger unqualified on the face of the Application.[8] Finally, the court finds no evidence that Koger performed the relevant services postpetition, supporting the conclusion that Koger was simply a prepetition creditor holding a contingent claim in these cases as opposed to a professional being employed to render

---

[8]The court would also have expected to see the Brokerage Agreement listed as an executory contract in Schedule G, and where it appears that Koger had produced Buyer No. 1 prepetition, the court would have expected to see a contingent commission claim in favor of Koger listed in Schedule F. Neither of these disclosures appears in Debtors' schedules.

postpetition services.

      The court appreciates the harshness of this result for Koger.  Koger introduced both Buyer No. 1 and Buyer No. 2 to Debtors (prepetition), and Buyer No. 2 eventually submitted the winning bid at the court's auction, a bid which was $1.5 million higher than any previous offer.  The ultimate benefit of the result to the estate cannot be gainsaid.  Unfortunately, while benefit to the estate may be a factor, it does not override the timeliness issue, as to which the court sees no explanation or excuse.  The court sees no grounds for excusing the timeliness issue.

      Koger notes in its Response, fn. 10, that it "may also be entitled to an administrative 'substantial contribution' claim pursuant to 11 U.S.C. §503(b)(3)(D)."  In so noting, Koger appears to acknowledge its status as a prepetition creditor, as such claims are only available to "a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders . . . ."  11 U.S.C. §503(b)(3)(D).  The court's conclusion herein is without prejudice to Koger's filing of an appropriate request for payment of an administrative expense claim pursuant thereto.

      The court will issue a separate order consistent with the foregoing .

cc:    Debtors' Counsel
       Counsel To Mervis Diamond Corporation
       Counsel To Molinaro Koger
       United States Trustee

**END OF MEMORANDUM OF DECISION**